**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

RICCO SANTANA,

                                        Plaintiff,                    9:17-cv-00102 (BKS/ML)

v.

STEVEN RACETTE, STEPHEN BROWN, and TAMMY
BEZIO,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Martin E. Adams
Adams & Commissiong LLP
65 Broadway, Suite 1603
New York, NY 10006

*For Defendants:*
Letitia James
Attorney General for the State of New York
Ryan W. Hickey
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224-0341

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiff Ricco Santana brings this civil rights action under 42 U.S.C. § 1983, raising

claims arising from his incarceration at Clinton Correctional Facility ("Clinton") against

Defendants Steven Racette, Stephen Brown, and Tammy Bezio. (Dkt. No. 33). Plaintiff brings

Eighth Amendment failure to protect, failure to intervene, and denial of medical care claims, as

well as claims that Defendants failed to adequately train and supervise security staff. (*Id.*).

Defendants now move for summary judgment under Federal Rule of Civil Procedure 56, which Plaintiff opposes. (Dkt. Nos. 58, 65, 66). The parties also jointly move to seal certain documents that were filed with Plaintiff's summary judgment response. (Dkt. Nos. 67, 69). For the reasons that follow, Defendants' motion for summary judgment is granted, and the parties' motion to seal is granted in part.

## II.     JOINT REQUEST TO SEAL

### A.     Legal Standard

Under Northern District of New York Local Rule 83.13(a), "[a] party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard." L.R. 83.13(a). "Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013).

### 1.     Common Law Right of Access

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo ("Amodeo II")*, 71 F.3d 1044, 1048 (2d Cir. 1995). Before this "common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.'" *Lugosch*, 435 F.3d at 119. "[T]he mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. . . . [T]he item filed must be

relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *United States v. Amodeo ("Amodeo I")*, 44 F.3d 141, 145 (2d Cir. 1995). "[T]here is a presumption of access to documents submitted to the court at summary judgment." *Lugosch*, 435 F.3d at 122 (citing *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

After determining that the documents are judicial documents and that the "common law presumption of access attaches," the court must "determine the weight of that presumption." *Id.* at 119. When a document plays a role in a court's adjudication of litigants' substantive rights—a function that is "at the heart of Article III"—the presumption is strong, but "[a]s one moves along the continuum, the weight of the presumption declines." *Id.* "[E]vidence introduced at trial or in connection with summary judgment enjoys a strong presumption of public access." *Brown v. Maxwell*, 929 F.3d 41, 49–50 (2d Cir. 2019).

Finally, the court must balance "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. Such considerations "include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" *Id.* (quoting *Amodeo II*, 71 F.3d at 1050); *accord Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 143 (2d Cir. 2016). When weighing privacy interests, courts should consider "the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051.

## 2. First Amendment Right of Access

"[T]here exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion." *Lugosch*, 435 F.3d at 124. The First Amendment right of access stems from the qualified right of the public and the press "to attend judicial proceedings and to access certain judicial documents." *Id.* at 120 (quoting *Hartford*

*Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). Once a court concludes that there is a qualified First Amendment right of access to the judicial documents at issue, it may only seal the documents "if specific, on the record findings are made demonstrating the closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). Examples of "higher values," *Lugosch*, 435 F.3d at 125, include law enforcement interests and the privacy of innocent third parties. *Amodeo II*, 71 F.3d at 1050.

### B.      Application

The parties jointly request an order sealing certain documents that Plaintiff filed with his summary judgment response.[1] (Dkt. No. 69). Specifically, they move to seal: a non-party inmate's disciplinary history, (Dkt. No. 65-4); prison walkthrough records, disciplinary, movement, classification, and programming histories of two non-party prisoners, (Dkt. No. 65-6)[2]; and a non-party inmate's hearing record sheet. (Dkt. No. 65-9). Defendants argue that these documents overcome the presumption of access because they concern both law enforcement and privacy interests. (Dkt. No. 69, at 2–3). As Defendants acknowledge, the two non-party prisoners whose records are at issue were involved in the events of this case. (Dkt. No. 69, at 2).

---

[1] On June 11, 2019, Magistrate Judge David E. Peebles approved a protective order in this case. (Dkt. No. 50). However, that documents are governed by a protective order in civil discovery does not satisfy a party's burden under *Lugosch*, 435 F.3d. *See e.g.*, *Collado v. City of New York*, 193 F. Supp. 3d 286, 289–90 (S.D.N.Y. 2016) ("[T]hat a document was produced in discovery pursuant to a protective order has no bearing on the presumption of access that attaches when it becomes a judicial document.").

[2] Docket Number 65-6 can be broken down as follows: pages 1–4 and 9-39 contain disciplinary, classification, facility employment, and inter and intra-facility movement records concerning the first non-party prisoner; pages 40–70 contain similar documents concerning the second non-party prisoner; pages 71–98 contain similar documents concerning Plaintiff; and pages 5-8 and 99–101 appear to be reports and activity logs referencing the three altercations underlying Plaintiff's claims. (Dkt. No. 65-6). The letter brief does not address the documents concerning Plaintiff in Docket Number 65-6, at pages 71–98. The Court notes, however, that these documents contain personal identifiers, which should be redacted. *See* N.D.N.Y. Local Rule 8.1. Defendants are therefore directed to resubmit a redacted version of Docket Number 65-6, pages 71–98, with personal identifiers redacted.

"[I]t is well-settled that 'documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment.'" *Brown*, 929 F.3d at 47 (quoting *Lugosch*, 435 F.3d at 121). As the documents the parties seek to seal are summary judgment submissions "used to determine litigants' substantive legal rights," they are subject to the "highest" presumption of access, and "should, absent exceptional circumstances, be subject to public scrutiny." *Lugosch*, 435 F.3d at 121, 123, 124 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

Next the Court balances the competing considerations. Here, the documents the parties seek to seal implicate law enforcement interests. Defendants assert that public access to "disciplinary, internal movement, classification, [and] programming records" relating to Clinton's operation, "poses potential security risks." (Dkt. No. 69, at 1–2). Defendants note that Department of Corrections and Community Supervision ("DOCCS") "inmates are not permitted to possess" these kinds of records of "other inmates"; that inmates may use such records for "nefarious purposes"; and that security risks are heightened here, as the prisoners at issue have gang affiliations. (*Id.* at 2). Indeed, the Second Circuit has explained that "consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information" is relevant to the balancing inquiry. *Amodeo II*, 71 F.3d at 1051; *Mirlis v. Greer*, 952 F.3d 51, 56 (2d Cir. 2020); *Burns v. Nagy*, No. 16-cv-782, 2019 WL 2409737, at *2, 2019 U.S. Dist. LEXIS 96576, at *5 (S.D.N.Y. June 7, 2019) (finding that identifying features of a chemical agent should remain sealed where disclosure "could impair law enforcement by apprising inmates of the nature and use of a law enforcement tool necessary for maintaining institutional security").

The documents, which contain references to unrelated disciplinary hearings, details of the two inmates' underlying crimes and their physical and mental health histories, also implicate privacy interests. Although the non-party inmates were involved in the events of this case, the Court finds that the privacy interests of third parties nevertheless apply, particularly when considered in conjunction with the law enforcement interests identified above. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-4394, 2017 WL 1331288, at *11, 2017 U.S. Dist. LEXIS 55881, at *41–42 (S.D.N.Y. Apr. 4, 2017) (finding that "non-parties' confidential customer information" was "sufficiently sensitive to merit protection"); *see also Amodeo II*, 71 F.3d at 1051 (instructing that courts should "consider the degree to which the subject matter is traditionally considered private rather than public").

The Court notes that the documents in Docket Number 65-6 include reports and logs concerning the altercations underlying Plaintiff's claims which are described in the complaint and in the parties' memoranda. (*See* Dkt. No. 65-6, at 99 (log documenting February 28, 2015 altercation); *id.* at 5–8, 100 (reports and log concerning March 30, 2015 altercation); *id.* at 101 (log documenting May 21, 2015 altercation)). Counsel have not identified any basis for sealing those documents.

Thus, as both law enforcement and third-party privacy concerns are present in the remaining documents, the Court finds that these "higher values" warrant a "narrowly tailored" sealing, *Lugosch*, 435 F.3d at 126, of the following: Docket Numbers 65-4 and 65-9 and the following pages of Docket Number 65-6: 1–4 and 9–70.

## III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    Facts[3]

Plaintiff was a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") until he was paroled on November 5, 2015. (Dkt. No. 58-15, ¶¶ 1–4). During the relevant period, Plaintiff was incarcerated at Clinton. (*Id.* ¶ 2; Dkt. No. 58-3, at 32–33; Dkt. No. 65-6, at 85). Plaintiff joined the "Bloods" gang prior to his incarceration. (Dkt. No. 58-15, ¶ 3). When Plaintiff arrived at Clinton, he was classified by DOCCS as a gang member.[4] (Dkt. No. 58-3, at 38–39). Plaintiff was subsequently involved in three altercations with other prisoners.

#### 1.    February 28, 2015 – First Altercation

The first altercation occurred on February 28, 2015 at approximately 10:25 a.m. in Clinton's north yard (Dkt. No. 58-15, ¶ 5). Plaintiff testified that he was approached by a prisoner, Inmate Johnson, who was also a member of the Bloods. (Dkt. No. 58-3, at 39, 42). Plaintiff had seen Johnson "in the street a couple of times" in 2001 or 2002 for "gang-related stuff" in New York City. (*Id.* at 40). Plaintiff had not seen Johnson since then. (*Id.*).

Plaintiff testified that when Johnson approached him in the "north yard," he instructed Plaintiff to perform a hit on someone at the prison "in order to get out."[5] (*Id.* at 43). Plaintiff

---

[3] In resolving Defendants' motion for summary judgment, the facts are drawn, in part, from the Defendants' statement of material facts. (Dkt. Nos. 58-15). Plaintiff responded to each of Defendants' factual statements by stating that the "facts contained" in each statement "are not in dispute." (Dkt. No. 65-2, at 1–5). The Court has also considered Plaintiff's statement of material facts, (*id.* at 5–7), and the parties' attached exhibits. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[4] Plaintiff testified that when he entered DOCCS in 2014, he was questioned as to whether he was aware of any enemies that he had in the prison system; he answered that he was not aware of any enemies. (Dkt. No. 58-3, at 149). Plaintiff further testified that he was assigned a counselor upon arrival to Clinton and that he never discussed his gang affiliation with his counselor. (Dkt. No. 58-15, ¶ 42; Dkt. No. 58-3, at 41–42).

[5] Although Plaintiff's deposition transcript is not entirely clear, this appears to refer to Plaintiff's efforts to leave the Bloods. (Dkt. No. 58-3, at 42–43).

testified that he refused Johnson's request because Plaintiff was at Clinton "for a parole violation" and if he performed the hit, he would "catch a new charge." (*Id.* at 42). Once Plaintiff refused, Johnson swung at Plaintiff, who got in "defense mode" and the two "roll[ed] around" until they were instructed to "stop." (*Id.*). Plaintiff estimated that the altercation lasted a minute or less. (*Id.* at 156). Plaintiff testified that he had no issues with Johnson prior to this first altercation, (*id.* at 41), and that he did not know how Johnson learned that Plaintiff wanted to leave the gang. (*Id.* at 43).

Plaintiff was seen by a facility nurse that day as a result of the fight in the yard. (Dkt. No. 58-15, ¶¶ 10–12; Dkt. No. 58-9). The nurse prepared an injury report, noting that Plaintiff was "alert, oriented, [and] ambulatory" and that Plaintiff stated that his altercation with Johnson stemmed from "a problem from the street." (Dkt. No. 58-15, ¶¶ 11–12; Dkt. No. 58-9). Plaintiff suffered scratches on his cheek and forehead as well as a "small abrasion." (Dkt. No. 58-9; Dkt. No. 58-3, at 141–42).

That same day, Plaintiff signed a memorandum addressed to Defendant Stephen Brown, Clinton's Deputy Superintendent for Security, declining an offer to be placed in protective custody.[6] (Dkt. No. 58-15, ¶ 15). The memorandum stated, "I feel I do not need protection at this time. If I feel I need protection in the near future, I will so inform you."[7] (*Id.*; Dkt. No. 58-5; Dkt. No. 58-3, at 95–97). The document has a "Witnessed by" line that is signed by a Sergeant J. Ludwig. (Dkt. No. 58-5; Dkt. No. 58-3, at 100–01). Although he could not remember Sergeant Ludwig, Plaintiff agreed that this officer would have been involved in offering him protective

---

[6] In his deposition, Brown testified that although his name is printed on the protective custody refusal forms that Plaintiff signed, he would not review an incident unless it were unusual. (Dkt. No. 58-13, at 54). He further testified that, with respect to involuntary protective custody, that would be "a direct line supervisor's responsibility" to make such a recommendation. (*Id.* at 56).

[7] Plaintiff testified that he refused protective custody because "it's like being in jail and you're already in jail." (Dkt. No. 58-3, at 97).

custody and that if Plaintiff had told Sergeant Ludwig that he wanted to go to protective custody that day, he would have been able to do so.[8] (*Id.*). Plaintiff also agreed that the only way to guarantee that prisoners do not encounter one another in the facility is to enter protective custody. (*Id.* at 105). Plaintiff testified that he never notified anybody that he was in fear for his safety prior to this first incident. (*Id.* at 161).

Plaintiff received and pled guilty to a misbehavior report for the fight with Johnson. (Dkt. No. 58-15, ¶¶ 6–9; Dkt. No. 58-3, at 44; Dkt. No. 58-4; Dkt. No. 65-3, at 1). As a result, Plaintiff was sentenced to and served 30 days of keeplock in Clinton's D Block. (Dkt. No. 58-15, ¶ 10). At no point during his time in keeplock—from February 28th through March 30th—did Plaintiff raise any concern regarding being placed back into the general population, although he testified that he had opportunities to do so. (Dkt. No. 58-3, at 113–14).

## 2. March 30, 2015 – Second Altercation

On March 30, 2015, Plaintiff was released from keeplock and returned to the general population. (Dkt. No. 58-15, ¶ 17). Plaintiff and Johnson were housed in the same cell block, with Plaintiff housed in cell 21 and Johnson in cell 24. (Dkt. No. 65-5; Dkt. No. 65-6, at 32). That same day, Plaintiff and Johnson had a second altercation. (Dkt. No. 58-15, ¶ 18; Dkt. No. 58-3, at 52–53). Approximately three hours after Plaintiff reentered general population, Plaintiff exited his cell "to go to the mess hall," and was "walking down the corridor," when Johnson struck him in "the side of [his] face." (Dkt. No. 58-3, at 53–54, 157). Corrections officers separated the two men, and Plaintiff heard an unidentified officer say, "didn't you guys just have an incident, didn't you just get off keeplock?" (*Id.* at 54).

---

[8] Plaintiff further testified that, at the time, he did not "know that it was going to be an ongoing thing," (Dkt. No. 58-3, at 102), referring to the subsequent altercations.

That same day, Plaintiff again was offered and declined to be placed in protective custody, signing the same kind of memorandum as before. (Dkt. No. 58-15, ¶¶ 21–23; Dkt. No. 58-6). Plaintiff was given a misbehavior report for this altercation, a hearing was held, and Plaintiff was found not guilty. (Dkt. No. 58-15, at 62). Plaintiff testified that he now believed something was going on related to him attempting to leave the gang and that "this could escalate even worse" but that he never notified anybody at the prison that he feared for his safety prior to this second incident. (Dkt. No. 58-3, at 112, 161–62).

After this second altercation, the officers took Plaintiff "straight to the infirmary" where he was seen by a nurse. (Dkt. No. 58-3, at 54; Dkt. No. 58-15, ¶ 19; Dkt. No. 58-10). Plaintiff estimated that he spent six days in the Clinton infirmary before he was taken to Adirondack Medical Center ("Adirondack") where he was diagnosed with a fractured jaw and had surgery. (Dkt. No. 58-15, ¶ 20; Dkt. No. 58-3, at 66). After about two days in the hospital, Plaintiff returned to Clinton's medical unit where Plaintiff remained for "a couple of months." (Dkt. No. 58-15, ¶ 20; Dkt. No. 58-3, at 68–69). Plaintiff testified that he returned to Adirondack to have wires removed that had been installed in his mouth. (Dkt. No. 58-3, at 72). When Plaintiff returned to Clinton, he was placed in general population. (*Id.*).

### 3.    May 21, 2015 – Third Altercation

On May 21, 2015, Plaintiff was involved in a third altercation, this time with Inmate Lathrop in the Clinton yard. (Dkt. No. 58-15, ¶ 24; Dkt. No. 58-3, at 73). Plaintiff testified that this occurred on the "same day they . . . removed the wires off [his] mouth" and that he had been in general population for approximately one to three hours. (Dkt. No. 58-3, at 73). Plaintiff went to the yard to use the phone to call his family to "touch base with them" and "let them know that [he was] all right" because he had not "been able to speak to them" while his jaw was "wired shut." (Dkt. No. 58-3, at 74).

At that point, Lathrop "came at" Plaintiff and "started attacking [him]." (Dkt. No. 58-3, at 74). Corrections officers ordered the men "on the ground," and Plaintiff complied. (Dkt. No. 58-3, at 74, 77). Plaintiff testified that he did not know why Lathrop attacked him; Plaintiff did not know Lathrop and had never seen or interacted with him before this incident. (Dkt. No. 58-15, ¶ 25; Dkt. No. 58-3, at 75, 79, 139). As a result of the altercation, Plaintiff testified that he aggravated his jaw injury. (*Id.* at 74, 146–47). Plaintiff thought the attack might be gang related, (*id.* at 75), and that inmates and the Bloods posed a danger. (*Id.* at 117). Plaintiff testified that he was placed "back on keeplock." (*Id.* at 78). On May 21, 2015, Plaintiff again declined an offer to be placed in protective custody, signing a memorandum just as before.[9] (Dkt. No. 58-15, ¶¶ 26–28; Dkt. No. 58-7; Dkt. No. 58-3, at 115).

### 4.      June 4, 2015 – Plaintiff Requests Protective Custody

On June 4, 2015, Plaintiff for the first time expressed concern to Clinton staff regarding his safety, signing a form stating that he was in danger due to gang-related issues with other prisoners and that he wished to be placed in voluntary protective custody. (Dkt. No. 58-15, ¶ 29; Dkt. No. 58-8; Dkt. No. 58-3, at 163–64). He was placed in protective custody that day.[10] (Dkt. No. 58-15, ¶ 30). Plaintiff testified that "hearing people talk" about his situation and "want[ing] to get out of that jail" and "want[ing] to get home" caused him to change his mind about protective custody following the May 21st incident. (Dkt. No. 58-3, at 118). Plaintiff further testified that once he was placed in protective custody, he had no further gang-related incidents with Johnson, Lathrop, or any other inmates. (*Id.* at 121). Plaintiff remained in protective

---

[9] Plaintiff testified that he refused protective custody on May 21st because he would be "classified as being . . . a stone-cold rat" and that he "was scared." (Dkt. No. 58-3, at 117).

[10] This paragraph of Defendants' statement of facts says "June 4, 2014," but the Court presumes the parties mean June 4, 2015. (Dkt. No. 58-15, ¶ 30; *see also id.* ¶¶ 29, 31; Dkt. No. 58-8).

custody until August 24, 2015 when he was transferred to Great Meadow Correctional Facility ("Great Meadow"). (Dkt. No. 65-6, at 85; Dkt. No. 58-3, at 122, 135).

Plaintiff could not recall any communication with Defendants. (Dkt. No. 58-15, ¶ 37; Dkt. No. 58-3, at 128–29, 135). Defendant Brown did not recall participating in any investigation regarding Plaintiff's three altercations or "reviewing any protective custody request or refusal" from Plaintiff. (Dkt. No. 58-15, ¶ 3).

### 5. Prisoners Escape from Clinton

On June 5, 2015, the day after Plaintiff was placed in protective custody, two prisoners escaped from Clinton. (Dkt. No. 65-2, ¶ 17; Dkt. No. 65-10; Dkt. No. 58-12, at 22). Without being detected, they made a hole in the walls of their cells and escaped. (Dkt. No. 65-2, ¶ 18; *see also* Dkt. No. 65-10). The State of New York Office of the Inspector General ("OIG") investigated the escape. (*See generally id.*). According to an OIG report, a DOCCS deputy commissioner testified that "multiple failures amounted to 'a culture of carelessness' regarding security at Clinton," and the report described deficiencies in DOCCS's training of security and civilian staff. (Dkt. No. 65-10, at 91, 141–43).

### 6. Defendants' Duties

#### a. Defendant Racette

At the time of the three altercations described above, Defendant Steven Racette was Clinton's Superintendent. He testified that he would not review the placement of prisoners in either voluntary or involuntary protective custody. (Dkt. No. 58-12, at 15). He further testified that he had generally no involvement in handling prisoner discipline. (*Id.* at 16). Racette testified that he had not reviewed any documents, reports, or incidents involving Plaintiff. (*Id.* at 23).

### a. Defendant Brown

During the relevant time period, Brown was Clinton's Deputy Superintendent. (Dkt. No. 58-15, ¶ 33). Brown was not involved in the investigation of the incidents involving Plaintiff described above. (*Id.* ¶ 38; Dkt. No. 58-13, at 53). He did not recall reviewing any protective custody request or refusal from Plaintiff. (Dkt. No. 58-15, ¶ 39; Dkt. No. 58-13, at 53). He testified that he did not author or review any of the documents involving Plaintiff that he subsequently reviewed during his deposition, including the disposition of Plaintiff's hearing following the February 28, 2015 incident or the misbehavior report from the March 30th incident that Plaintiff signed. (*Id.* at 33, 53).

### b. Defendant Bezio

Defendant Tammy Bezio was a corrections officer employed at Clinton as a "movement and control officer." (Dkt. No. 58-15, ¶ 34; Dkt. No. 58-14, at 9). In that role, Bezio's duties were limited to identifying open cells in Clinton's computer system when asked to do so by a sergeant. (Dkt. No. 58-15, ¶ 35). Bezio testified that she would "just move the inmate" after others investigated whether there should be any constraints as to where that inmate should be housed. (Dkt. No. 58-14, at 28). Bezio was not involved in decisions regarding whether to move a prisoner from one cell to another and did not participate in investigating incidents or inmate medical care. (Dkt. No. 58-15, ¶ 36; Dkt. No. 58-14, at 28–29).

### B. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## C.    Discussion

### 1.    Personal Involvement

Defendants argue they are entitled to summary judgment because Plaintiff has failed to establish that any of them was personally involved in the alleged constitutional violations. (Dkt. No. 58-16, at 7–11). Plaintiff does not address Bezio's involvement but argues that Brown and Racette had personal involvement because "Racette was the policy maker and supervisor of Clinton" during the relevant time period and that Racette and Brown were grossly negligent and that "there were significant lapses in training," pointing to the OIG report regarding the prison escapees. (Dkt. No. 65, at 8–9).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (first quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); and then citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). Personal involvement of a supervisory defendant may be shown in several ways. In addition to (1) direct participation, a plaintiff may show that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

(the "*Colon* factors"). *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)[11] (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)). "To succeed on a supervisory liability claim, a plaintiff must 'show an affirmative causal link between the supervisor's inaction and [the plaintiff's] injury.'" *Estate of Chamberlain v. City of White Plains*, No. 16-3935, 2020 WL 2820176, at *13, 2020 U.S. App. LEXIS 17229, at *34 (2d Cir. May 29, 2020) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 (2002)).

---

[11] Defendants note that the "continued viability" of some of the *Colon* factors is "arguably called into question by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." (Dkt. No. 58-16, at 8 n.3). In *Iqbal*, 556 U.S. 662, 676 (2009), the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's individual actions, has violated the Constitution." The Second Circuit has not yet resolved how *Iqbal* affects *Colon*'s standard for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"). This Court has concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is consistent with the particular constitutional provision alleged to have been violated." *Montanez v. City of Syracuse*, No. 16-cv-0550, 2019 WL 315058, *18, 2019 U.S. Dist. LEXIS 10351, *50 (N.D.N.Y. Jan. 23, 2019) (internal quotation marks and citation omitted). Here, since Plaintiff's constitutional claims do not require a showing of discriminatory intent, but rest on the Eighth Amendment's deliberate indifference standard, the Court will apply the *Colon* factors. *See, e.g.*, *Tangreti v. Semple*, 2019 WL 4958053, at *7 n.3 2019 U.S. Dist. LEXIS 174360, at *19 n.3 (D. Conn. Oct. 8, 2019).

### a.      Defendant Bezio

Defendants argue that Bezio is entitled to summary judgment because "the record contains no indication" that Bezio "has knowledge of the plaintiff or the incidents alleged in the Complaint." (Dkt. No. 58-16, at 8). As noted, Plaintiff's response to Defendants' motion does not specifically mention Bezio.[12] (*See* Dkt. No. 65). The Court agrees with Defendants.

Bezio testified that she was a "movement and control officer" at Clinton in 2015. (Dkt. No. 58-14, at 9). She explained that she would "move inmates throughout the day." (*Id.*). It is undisputed that Bezio's role in inmate transfers was limited to "identifying open cells within Clinton's computer system when asked to do so by a sergeant" and that she had "no involvement in the decision whether to move an inmate, did not participate in the investigation of incidents at Clinton that might precipitate an inmate move, and did not participate in inmate medical care." (Dkt. No. 58-15, ¶¶ 35–36). By the time Bezio was required to place a prisoner in a cell, she testified that she would receive "information from the sergeant" saying that prisoner was "cleared" and that the prisoner had "signed off" on the fact that "they have no enemies" in the prison. (Dkt. No. 58-14, at 21). Bezio further testified that she would not review prisoner records or information and that she would "just move the inmate after [sergeants] do all that investigation." (*Id.* at 22). *See Bratton v. Goord*, No. 02-cv-185, 2006 WL 5564143, at *3, 2006 U.S. Dist. LEXIS 97128, at *9 (N.D.N.Y. May 23, 2006) (finding a nurse "did not have the requisite personal involvement" for a medical indifference claim where "it was not within [the nurse's] discretion to assent" to the plaintiff's treatment); *see also Kuck v. Danaher*, 822 F. Supp. 2d 109, 140 (D. Conn. 2011) (finding that the plaintiffs "failed to plausibly allege" that a

---

[12] The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim. *E.g.*, *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008). In its discretion, the Court elects to address the claim.

state employee "was personally involved in [an] alleged due process violation" where the

employee had no "discretion regarding scheduling decisions or that she was performing anything

other than purely ministerial and administrative duties").

Moreover, Plaintiff has cited nothing in the record demonstrating that Bezio had any

involvement in any alleged constitutional violation; Plaintiff testified at his deposition that he did

not recognize Bezio's name. (Dkt. No. 58-3, at 136). Thus, summary judgment is granted to

Bezio.

### b.    Defendants Racette and Brown

Plaintiff argues that Racette and Brown are liable under the third and fourth *Colon*

factors. (Dkt. No. 65, at 8). Specifically, Plaintiff argues that Racette "was the policy maker and

supervisor of Clinton from February 28, to May 21, 2015" and that the "policy and custom was

to allow for a chronic indifference toward security." (Dkt. No. 65, at 8). Plaintiff points to the

fact that "prior to" and "[d]uring that time," "two inmates" managed to "dig a hole undetected by

corrections officers" and that this shows that "security at Clinton was in a state of disarray."

(Dkt. No. 65, at 8). In their reply, Defendants argue that with respect to the third *Colon* factor,

Plaintiff has not shown that his alleged constitutional violations were brought about by any

DOCCS policy or custom. (Dkt. No. 66, at 4). With respect to the fourth *Colon* factor,

Defendants argue that Plaintiff has not shown the requisite gross negligence to establish personal

involvement because a "defendant is not personally involved simply because he or she holds a

position of authority or supervision over other officials." (*Id.*).

### i.    Third *Colon* Factor

Under the third *Colon* factor, Plaintiff must establish that the defendant created a policy

or custom under which unconstitutional practices occurred, or allowed the continuance of such a

policy or custom. *Colon*, 58 F.3d at 873.

Plaintiff's assertion of personal involvement under the third *Colon* factor fails to withstand summary judgment. First, the alleged "policy and custom" in this case, which Plaintiff identifies as "a chronic indifference to security," (Dkt. No. 65, at 8), appears to quote a conclusion from the OIG report regarding the two escaped prisoners.[13] (*See* Dkt. No. 65-10, at 144). Plaintiff does not point to any relevant DOCCS policy or custom of inadequate security practices concerning inmate safety, much less one that Racette or Brown created or permitted to continue. *See Rogoz v. City of Hartford*, No. 11-cv-00500, 2012 WL 4372189, at *8, 2012 U.S. Dist. LEXIS 136405, at *25 (D. Conn. Sept. 24, 2012) (dismissing supervisory liability claim where the complaint failed to allege that the supervisor "created a specific policy or custom under which the alleged unconstitutional practices occurred, or allowed them to continue").

Nor is there evidence of any underlying constitutional violation, as *Colon* requires. *See Elek v. Incorporated Village of Monroe*, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) ("[B]ecause Plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisor liability."). In order to establish an Eighth Amendment violation for failure to protect an inmate from harm, a plaintiff must "show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison official acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted); *Lewis v. Siwicki*, 944 F.3d 427, 430–31 (2d Cir. 2019). Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the

---

[13] The OIG report focuses on security lapses at Clinton that allowed the two prisoners to escape and not on issues of inmate conflict or safety. (*See generally* Dkt. No. 65-10).

official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.[14]

Here, there is no evidence of deliberate indifference by any prison official. On February

28th, Plaintiff and Johnson fought in the Clinton yard. (Dkt. No. 58-15, ¶ 5). That day, Plaintiff

was offered placement in protective custody, which he declined by signing the form stating, "I

feel I do not need protection at this time. If I feel I need protection in the near future, I will so

inform you." (*Id.* ¶¶ 13–15). At no point prior to the March 30, 2015 altercation with Johnson did

Plaintiff alert "any Clinton staff that he feared for his safety in general population and that he

wished to go to protective custody when his 'keeplock time ended." (*Id.* ¶ 16). Plaintiff again

declined protective custody and signed the same form following the March 30th and May 21st

incidents. (*Id.* ¶¶ 22–23, 26–28). Then, on June 4, 2015, it is undisputed that Plaintiff "for the

first time expressed his concern to Clinton staff that he was in danger due to gang-related issues

with other inmates and indicated that he wished to be in protective custody." (*Id.* ¶ 29). That

same day, Plaintiff was admitted to protective custody where he remained until his transfer to

Great Meadow. (*Id.* ¶ 30). Thus, Plaintiff has failed to establish either the requisite underlying

constitutional violation or any causal link to a supervisor's conduct. *Nicholson v. Fischer*, No.

13-cv-6072, 2018 WL 2009432, at *5, 2018 U.S. Dist. LEXIS 72199, at *16 (W.D.N.Y. Apr. 30,

2018). Accordingly, his argument with respect to the third *Colon* factor fails.

### ii.     Fourth *Colon* Factor

Under the fourth *Colon* factor, Plaintiff must establish that Racette and Brown were

"grossly negligent in supervising subordinates who committed the wrongful acts." *Colon*, 58

---

[14] Plaintiff has not responded to Defendants' motion for summary judgment on his claim of deliberate indifference to his medical needs, or failure to intervene and the Court deems those claims abandoned. *Feacher*, 563 F. Supp. 2d at, 399. In any event, those claims also fail for lack of evidence of any constitutional violation or supervisory liability.

F.3d at 873. The Second Circuit has defined gross negligence as "conduct that demonstrates a 'heedless indifference to consequences to another,' meaning the 'kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Estate of Chamberlain*, 2020 WL 2820176, at *13, 2020 U.S. App. LEXIS 17229, at *34 (quoting *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991)).  A constitutional violation is necessary to establish supervisory liability under the fourth *Colon* factor. *See Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

Plaintiff's claim fails because he has not adduced evidence of either an underlying constitutional violation or of gross negligence. It is undisputed that Brown did not participate in investigating the incidents described in Plaintiff's complaint and that he "did not recall reviewing any protective custody request or refusal" by Plaintiff. (Dkt. No. 58-15, ¶¶ 38–39). Racette, for his part, testified that he did not "recall reviewing" any documents, reports, or incidents involving Plaintiff and that reviewing the assessment or placement of someone in voluntary protective custody "would not rise to [the superintendent's] level." (Dkt. No. 58-12, at 15, 23).

Thus, Plaintiff's argument to establish personal involvement under the fourth *Colon* factor fails. *Colon*, 58 F.3d at 873–74 (explaining that the plaintiff's evidence "contains nothing that would support a claim that [the supervisory defendant] either knew or should have known of the events of which [the plaintiff] complains" and that "[i]n the absence of such facts, there is no basis for a jury finding of gross negligence (or deliberate indifference), and summary judgment is proper").[15] Because Plaintiff has failed to establish the personal involvement of Racette and Brown, his § 1983 claims against them fail as a matter of law.

---

[15] Plaintiff's reliance on *Alexander v. Cuomo*, No. 17-cv-309, 2018 WL 2041576, at *6, 2018 U.S. Dist. LEXIS 219712, at *17–19 (N.D.N.Y. Feb. 26, 2018) is misplaced. In *Alexander*, unlike here, the aftermath surrounding the

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the parties' joint request for the entry of a sealing order for Docket

Numbers 65-4, 65-6, and 65-9, (Dkt. Nos. 67, 69), is **GRANTED in part**; and it is further

**ORDERED** that the clerk of court is instructed to change the restriction on the docket for

Docket Numbers 65-4, 65-6, and 65-9 to sealed; and it is further

**ORDERED** that Defendants are directed to submit a separate, redacted version of

Docket Number 65-6, for public filing, by July 10, 2020, as follows: pages 5–8 and 99–101

should be refiled without alteration; pages 71–98 should be refiled with personal identifiers

redacted in accordance with N.D.N.Y Local Rule 8.1; finally, placeholder pages should be

submitted for pages 1–4 and 9–70 with a notation on each page "Filed with the Court under

seal"; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 58) is

**GRANTED**; and it is further

**ORDERED** that the Second Amended Complaint (Dkt. No. 33) is **DISMISSED** in its

**ENTIRETY**.

**IT IS SO ORDERED.**

Dated:  June 22, 2020
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

escaped prisoners was directly related to the plaintiff's alleged constitutional deprivations. *Id.* Further, unlike here, the plaintiff in *Alexander* plausibly alleged that Racette "had reason to know" of the alleged constitutional violations. *Id.*, 2018 U.S. Dist. LEXIS 219712, at *18. Plaintiff has advanced no such evidence here.